UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| DR. JAY J. SCHINDLER,<br><br>          Plaintiff,<br><br>   vs.<br><br>REGIONAL HEALTH PHYSICIANS,<br>INC.,<br><br>        Defendant. | CIV. 13-5027-JLV<br><br>ORDER |

## INTRODUCTION

Plaintiff Dr. Jay Schindler filed a multi-count complaint against the defendant Regional Health Physicians, Inc. ("RHP"), his former employer. (Docket 1). RHP filed an answer and counterclaim. (Docket 6). Based on the parties' stipulation, an order dismissing count XIII of the complaint was entered. (Docket 14). On January 27, 2015, defendant filed a motion for partial summary judgment supported by defendant's statement of undisputed material facts. (Dockets 23 & 25). Plaintiff filed a statement of material facts in opposition to defendant's motion. (Docket 33). For the reasons stated, defendant's motion for partial summary judgment is granted.

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(a), a movant is entitled to summary judgment if the movant can "show[] that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Once the moving party meets its burden, the nonmoving party may not rest on the allegations or denials in the pleadings, but rather must produce affirmative evidence setting forth specific facts showing a genuine issue of material fact exists. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment. Id. at 248. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. at 247-48 (emphasis in original).

If a dispute about a material fact is genuine, that is, if the evidence is that a reasonable jury could return a verdict for the nonmoving party, then summary judgment is not appropriate. Id. However, the moving party is entitled to judgment as a matter of law if the nonmoving party fails to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "There can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id.

In determining whether summary judgment should issue, the facts and inferences from those facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.

574, 587-88 (1986).   In order to withstand a motion for summary judgment, the nonmoving party "must substantiate [his] allegations with 'sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy.' "   Moody v. St. Charles County, 23 F.3d 1410, 1412 (8th Cir. 1994) (citing Gregory v. Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992), cert. denied, 507 U.S. 913 (1993)).   "A mere scintilla of evidence is insufficient to avoid summary judgment."   Moody, 23 F.3d at 1412.   The key inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."   Anderson, 477 U.S. at 251-52.

Once the moving party meets its burden, the nonmoving party may not rest on the allegations or denials in the pleadings, but rather must produce affirmative evidence setting forth specific facts showing a genuine issue of material fact exists.   Id. at 256; see also Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007) (mere allegations, unsupported by specific facts or evidence beyond a nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment); Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) ("The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial.   Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.") (internal quotation marks

and citation omitted). The non-moving party's own conclusions, without supporting evidence, are insufficient to create a genuine issue of material fact. Anderson, 477 U.S. at 256; Thomas, 483 F.3d at 527; Torgerson, 643 F.3d at 1042.

## UNDISPUTED MATERIAL FACTS

Defendant seeks judgment on the following breach of contract counts of the complaint: count I, failure to pay salary; count II, termination without cause;[1] count III, lack of notice and opportunity to cure; count IV, termination for cause; count VI, disability salary continuation plan; count VIII, failure to pay capital accumulation account benefits; count IX, failure to pay benefits due from extended illness accrual bank; count X, failure to pay for transportation to outreach clinic; and count XII, failure to pay production-based compensation.[2] (Docket 23). Defendant also seeks judgment on its counterclaim. Id.

The following recitation consists of the material facts undisputed by the parties. These facts are developed from the complaint (Docket 1), defendant's answer and counterclaim (Docket 6), plaintiff's reply (Docket 9), defendant's statement of undisputed material facts (Docket 25), and plaintiff's response to defendant's statement of undisputed material facts and additional statement of

---

[1]Dr. Schindler has abandoned this claim and consents to summary judgment in defendant's favor as to count II. (Docket 32 at p. 22).

[2]Dr. Schindler has abandoned this claim and consents to summary judgment in defendant's favor as to count XII. (Docket 32 at p. 22).

undisputed material facts (Docket 33). Where a statement of fact is admitted by the opposing party, the court will only reference the initiating document.

At all times relevant to this litigation Dr. Jay J. Schindler was a board-certified neurosurgeon licensed to practice medicine in the State of South Dakota. (Docket 1 ¶ 1). RHP is a South Dakota not-for-profit corporation located in Rapid City, South Dakota.[3] Id. ¶ 2. On or about April 30, 2007, Dr. Schindler entered into a Physician Employment Agreement ("Agreement") with RHP. Id. ¶ 5; see also Docket 25 ¶ 1. A copy of the Agreement is attached to the complaint. (Docket 1-1; see also Docket 28-1). The Agreement commenced on May 1, 2007, and was to continue until April 30, 2010. (Docket 28-1 § 1.2). Dr. Schindler was hired to practice neurosurgery and provide medical services in his specialty to RHP's patients. (Docket 25 ¶¶ 6 & 7).

Under the Agreement, Dr. Schindler was obligated to hold regular office hours at RHP's clinic in Rapid City and the outreach clinic in Aberdeen, South Dakota. (Docket 1 ¶ 8). For purposes of maintaining the outreach clinic in Aberdeen, RHP agreed to pay the costs of travel for Dr. Schindler between Rapid City and Aberdeen.[4] (Docket 25 ¶ 45).

---

[3]It is undisputed that RHP and Rapid City Regional Hospital ("RCRH") "are both wholly-owned subsidiaries of Regional Health, Inc., [and] they are separate corporations with separate management." (Docket 28-5 at p. 1).

[4]It is undisputed that RHP paid all of Dr. Schindler's air transportation costs. (Dockets 25 ¶ 46 and 33 ¶ 46). Dr. Schindler claims he is entitled to reimbursement for his mileage from the RHP clinic to the Rapid City airport and from the Aberdeen airport to the outreach clinic. (Docket 33 ¶ 46).

Dr. Schindler began his employment with RHP in May 2007. (Docket 1 ¶ 6). Dr. Schindler was paid on a production model which compensated him based upon his work. (Docket 25 ¶ 15). His work was tracked by RVUs,[5] which are the values assigned by the Centers for Medicare and Medicaid Services to each of the procedures and services provided by physicians. Id. ¶ 16. Compensation was determined at the end of the fiscal year which ran from July 1 to June 30. Id. ¶ 17. Dr. Schindler was guaranteed a minimum salary of 75 percent of the compensation earned in the preceding year. Id. ¶ 18. At the beginning of each fiscal year Dr. Schindler decided how much money he wanted to draw in anticipation of that year's earnings. Id. ¶ 19. This draw election could be between 75 percent and 95 percent of the preceding year's earnings. Id. At the end of each fiscal year the total RVUs produced by Dr. Schindler would be multiplied by an agreed conversion rate which would determine his total compensation for that year. Id. ¶ 20. Total compensation would be reconciled with Dr. Schindler's draw during that year. Id. ¶ 21. If Dr. Schindler earned more than what had been drawn, RHP would pay him the difference. Id. If Dr. Schindler's account was overdrawn at the end of the fiscal year, he would reimburse the difference to RHP. Id.

In 2009, Dr. Schindler "began to experience back and leg pain, difficulty walking and maintaining balance, reduced stamina, lack of sleep, temperature intolerance, and bowel and bladder complaints." (Docket 28-10 at p. 4). "As

---

[5]"Relative Value Units." (Docket 24 at p. 13).

Dr. Schindler began to experience these symptoms, which he . . . attributed to a history of low back pain, RHP provided a number of measures to accommodate them while he worked."  Id.  RHP "purchased a cooling vest . . . [and] a set of steps for him to use in the operating room so that he could support his body weight while he worked over patients, and it reimbursed [him] for a brace to wear during surgery."  Id.  Dr. Schindler never requested time off for illness while he was employed by RHP.  (Docket 25 ¶ 43).

In October 2009, RCRH notified Dr. Schindler that the hospital planned to suspend his surgical privileges to perform "elective instrumental cervical and lumbar fusion procedures" except "those procedures in an emergency situation." (Docket 33 at p. 7 ¶ 1).  On October 16, 2009, Dr. Schindler took a 60-day voluntary leave of absence from RCRH in lieu of the medical staff at the hospital suspending some of his surgical privileges.[6]  (Dockets 1 ¶ 10; 25 ¶ 2 & 28-2 at p. 3).  RHP acknowledged Dr. Schindler's leave of absence from medical privileges at RCRH and the parties agreed he should continue performing clinic duties during the leave of absence.  (Dockets 1 ¶ 11 & 28-16).

---

[6]Dr. Schindler's attorney claimed there were two reasons for the leave of absence.  First, any suspension of privileges lasting more than thirty days must be reported to the National Practitioner's Data Bank and the leave of absence would allow the RCRH investigative process to proceed without needing to be completed before the expiration of thirty days.  (Docket 28-2 at pp. 1-2). Second, this time period would allow Dr. Schindler to prepare a response to RCRH's medical review committee.  Id. at p. 2.  Dr. Schindler also claimed he was suffering significant back pain and hoped a leave of absence would allow him time to recover.  (Docket 33 at p. 7 ¶ 2).

On October 19, 2009, RHP reconfirmed this decision and advised Dr. Schindler that it "retains all of its rights pursuant to Dr. Schindler's Physician Employment Agreement and will be reviewing this situation internally to determine how Dr. Schindler's Leave of Absence from doing surgical care at Rapid City Regional Hospital might affect Dr. Schindler's compensation or other facets of that Agreement." (Docket 28-3). On October 29, 2009, RHP notified Dr. Schindler that it believed his primary duty was to provide medical services as an operating neurosurgeon and that his leave of absence limited him to "clinical work" which "constitutes a very small portion of the neurosurgical services for which RHP is contracting."[7] (Dockets 25 ¶ 12 & 28-4).

On November 12, 2009, Regional Health Physicians agreed to continue "paying Dr. Schindler his guarantee amount (75% of his annual projection) through the remainder of his 60-day Leave of Absence from the RCRH Medical Staff."[8] (Docket 28-7 at p. 1). The letter advised Dr. Schindler's attorney that:

> [RHP] maintains Dr. Schindler is not meeting the obligations of Section 1.3 of his Physician Employment Agreement, which

---

[7]Dr. Schindler does not deny this statement was made, but asserts his employer "did not notify [him] that it considered his leave of absence to be a 'suspension . . . or loss' of the required hospital privileges that could result in immediate termination without any opportunity to cure under the Contract or ask Dr. Schindler to 'cure' by ceasing his leave of absence from the Hospital and resume performing surgery." (Docket 33 ¶ 12).

[8]Plaintiff did not submit his attorney's letters of November 4 and November 10, 2009, to which this letter was responding. See Docket 28-7 at p. 1. The court must assume the contents of those letters would not create disputed material facts. D.S.D. Civ. LR 56.1(B), (C) and (D).

> contemplates Dr. Schindler's maintenance of a robust neurosurgical practice and provision of call coverage to . . . RCRH. [Dr. Schindler's attorney's statement] that he took his leave of absence in lieu of a precautionary suspension says only that he chose one form of breaching his employment agreement over another form of breaching his employment agreement. His ability and willingness to practice neurosurgery is the fundamental obligation of his agreement.[9]

Id. In the same letter, RHP stated "[f]or the month of October 2009, even with the reduction made to Dr. Schindler's draw for the pay period ending October 31, Dr. Schindler overdrew his actual production compensation by $146,618.10. It is readily apparent that even with the reduction in Dr. Schindler's draw amount, he will owe RHP a significant amount of money by the end of FY 2010." Id. at pp. 1-2. Dr. Schindler testified he did not know whether he was overdrawn or underdrawn on his account. (Docket 34-1 at p. 6 (p. 90:5-14)).

On December 23, 2009, RHP responded to earlier letters from Dr. Schindler's attorney.[10] (Docket 28-5). Assuming Dr. Schindler's leave of absence from the medical staff of RCRH had been extended, RHP indicated:

> [It would] continue to pay Dr. Schindler at his guarantee amount. However, the continuance of . . . pay is not a waiver of any rights RHP might assert under the Agreement with respect to Dr. Schindler's failure to satisfy the requirements of Section[s] 1.3., 3.3.2, or any other section of the Agreement. The performance of neurosurgical services per Section 1.3 is at the very heart of what

---

[9]See footnote 7 and Docket 33 ¶ 13.

[10]Plaintiff did not submit his attorney's letters of November 24 and December 8, 2009, to which this letter was responding. See Docket 28-5 at p. 1. The court must assume the contents of those letters would not create disputed material facts. D.S.D. Civ. LR 56.1(B), (C) and (D).

> the Agreement is all about, and RHP currently is not receiving those services from Dr. Schindler. Section 3.3.2 . . . provides RHP the right to terminate Dr. Schindler's employment "for cause" in the event of any suspension of Dr. Schindler's medical staff appointment and privileges. . . . In spite of Dr. Schindler's breaches of the Agreement, RHP will continue his pay. However, under the current circumstances RHP will not be able to pay Dr. Schindler at his guarantee indefinitely, and reserves the right to revisit the issue of Dr. Schindler's breaches at any point in time.[11]

Id. at pp. 1-2. Dr. Schindler continued to perform all clinic duties in Rapid City and Aberdeen during his leave of absence, including seeing patients, performing in-clinic procedures, overseeing nurse practitioners and other activities. (Docket 25 ¶ 27).

On March 10, 2010, RHP terminated Dr. Schindler's employment "for cause." (Dockets 1 ¶ 16 & 25 ¶ 4). The cause asserted for termination was Dr. Schindler's failure to maintain medical staff privileges necessary to perform surgery at RCRH.[12] (Docket 25 ¶ 5). The letter to Dr. Schindler's attorney announcing the termination decision stated:

> RHP has provided Dr. Schindler, through counsel, prior written notices of Dr. Schindler's breaches and failures under the Agreement. Reference [RHP's] letters to you dated October 29, November 12 and December 23, 2009 for those notices. Dr. Schindler's breaches and failures have continued for over four months. While RHP consented to advances to Dr. Schindler during the pendency of his leave without waiving any of its rights or remedies, RHP no longer will continue this course of action.

(Docket 28-6 at p. 1).

---

[11]See footnote 7 and Docket 33 ¶ 14.

[12]It is undisputed that Dr. Schindler extended his leave of absence from medical privileges at RCRH from December 16, 2009 through March 10, 2010 and beyond.

Other undisputed facts will be addressed during the analysis of each count of plaintiff's complaint.

## DISCUSSION

### A.    Applicable Law

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as it is a diversity action.    (Dockets 1 ¶ 3 & 6 ¶ 3).    In diversity actions, the court applies the substantive law of the forum state.    See Jordan v. NUCOR Corp., 295 F.3d 828, 834 (8th Cir. 2002).    "[F]ederal courts sitting in diversity cases, when deciding questions of 'substantive' law, are bound by state court decisions as well as state statutes."    Hanna v. Plumer, 380 U.S. 460, 465 (1965) (referencing Erie R. Co. v. Tompkins, 304 U.S. 64 (1938)).    See also In re Baycol Products Litigation, 616 F.3d 778, 785 (8th Cir. 2010) ("in a suit based on diversity of citizenship jurisdiction the federal courts apply federal law as to matters of procedure but the substantive law of the relevant state.") (internal citations omitted).    Only then can the court determine whether summary judgment is appropriate.    United States v. One Parcel of Real Property, 27 F.3d 327, 329 n.1 (8th Cir. 1994).    In this case, the forum state is South Dakota. Accordingly, the court shall apply South Dakota law.

### B.    Contract Interpretation

In South Dakota "[c]ontract interpretation is a question of law . . . ." Ziegler Furniture & Funeral Home, Inc. v. Cicmanec, 709 N.W.2d 350, 354 (S.D. 2006).    "When the meaning of contractual language is plain and unambiguous,

11

construction is not necessary.   If a contract is found to be ambiguous the rules of construction apply."   Id. (internal citation omitted).   " 'Whether the language of a contract is ambiguous is . . . a question of law.' "   Id. (internal citation omitted).   "A contract is ambiguous when application of rules of interpretation leave a genuine uncertainty as to which of two or more meanings is correct."   Id. at 355 (internal citation omitted).   See also Pauley v. Simonson, 720 N.W.2d 665, 668 (S.D. 2006) ("a contract is ambiguous only when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.").

"When determining the meaning of a contract, 'effect will be given to the plain meaning of its words.' "   Lillibridge v. Meade School Dist. #46-1, 746 N.W.2d 428, 432 (S.D. 2008) (quoting In re Dissolution of Midnight Star, 724 N.W.2d 334, 337 (S.D. 2006)).   "However, if the contract 'is uncertain or ambiguous,' parol and extrinsic evidence may be used for clarification.' "   Lillibridge, 746 N.W.2d at 432 (quoting Pauley, 720 N.W.2d at 667-68).   The court must examine "the language that the parties used in the contract to determine their intention."   Pauley, 720 N.W.2d at 667-68 (internal citation omitted).   "If that intention is clearly manifested by the language of the agreement, it is the duty of [the] court to declare and enforce it."   Id. at 668 (bracketing omitted).

**COUNT III: LACK OF NOTICE AND OPPORTUNITY TO CURE**

A fundamental question, the answer to which drives resolution of several of plaintiff's breach of contract claims which are the subject of defendant's motion for partial summary judgment, is: Whether the employment agreement required RHP to give Dr. Schindler notice of the alleged breach of contract and an opportunity to cure?   (Dockets 24 at p. 8 & 32 at p. 7).   The court concludes the answer to this question is "no."

The Agreement provided RHP could terminate Dr. Schindler "for 'cause'" for the "[s]uspension . . . or loss, whether temporary or permanent, of the required staff appointment and privileges provided in Section 1.1.4."[13]   (Docket 1-1 §§ 3.3 and 3.3.2).   In clear and unequivocal terms, the agreement separated those "for cause" justifications for immediate termination from those for which notice and a right to cure existed.

The causes for which immediate termination is available to the employer are:

>  3.3.1.   Suspension, revocation or loss, whether temporary or permanent, of a license to practice [medicine] . . . .
>
>  3.3.2.   Suspension, revocation or loss, whether temporary or permanent, of the required medical staff appointment and privileges . . . .

---

[13]Dr. Schindler claims the phrase " 'suspension . . . or loss' of hospital privileges" is not defined in the Agreement and does not "include a voluntary leave of absence."   (Docket 33 ¶ 10).

3.3.3. Cancellation or denial of medical malpractice insurance coverage . . . .

3.3.4. Conviction of a felony.

3.3.5. Exclusion, debarment or suspension of participation status in or sanction by the Medicare or Medicaid programs . . . .

3.3.6. Revocation or suspension of the D.E.A. permit . . . .

3.3.8. The Physician acting in an unprofessional, unethical or fraudulent manner if, in reasonable opinion of the Employer, such conduct is detrimental to the reputation, character and standing of the Employer (or any of its affiliated organizations).

3.3.9. Expulsion suspension or forced resignation by any medical professional organization.

3.3.10. Alcohol, substance or drug abuse and refusal or failure to obtain and strictly comply with treatment requirements, or repeat alcohol, substance or drug abuse thereafter.

(Docket 1-1 § 3.3). None of these "for cause" termination provisions contain a notice and right to cure provision. It is only in section 3.3.7. where notice and a right to cure exists:

3.3.7. Breach of any material provision of this Agreement by the Physician, but only after the Employer has given the Physician prior written notice of the alleged breach or failure and the Physician has not cured such breach or failure within thirty (30) days of receipt of the notice.

Id.

Dr. Schindler argues "RHP was obligated to give him an opportunity to cure" the breach associated with the leave of absence from the medical staff of RCRH. (Docket 32 at p. 10). He argues "[w]hile a physician could not 'cure' a

14

felony conviction within 30 days or practice medicine without a license, Dr. Schindler was capable of 'curing' his voluntary leave of absence from the hospital staff." Id. Even though Dr. Schindler acknowledges there is no notice and right to cure provision in paragraph 3.3.2, he asserts "the 30 day notice requirement of § 3.3.7 should apply." Id.

The immediate termination provisions without notice and an opportunity to cure make sense. A physician's loss of his license to practice medicine, loss of medical malpractice insurance coverage, loss of Drug Enforcement Agency ("DEA") permit privileges, or expulsion from a medical professional organization are events dictated by others and from which an individual does not have a "right to cure." Likewise, the loss of medical staff privileges is dictated by others.

Dr. Schindler argues because the RCRH's medical staff bylaws were not specifically incorporated into his employment contract with RHP and the phrase " 'suspension, revocation, or loss' of hospital privileges" is not defined in the contract, his voluntary leave of absence from medical staff privileges cannot be included in section 3.3.2. (Docket 33 at p. 9). This argument is without merit.

Dr. Schindler acknowledged his employment was "conditioned upon" him "remaining . . . [a]n appointed member, in good standing, of the active or associate medical staff of a Regional Health affiliated hospital as required by [RHP]." (Docket 1-1 § 1.1.4). When Dr. Schindler contracted to remain a member in good standing on RCRH's medical staff, he was obligated to abide by all of the rules, policies and procedures of the hospital. The same obligation

existed with respect to his medical license and DEA privileges. Dr. Schindler was obligated to comply with the rules of the DEA and the South Dakota Medical Association even though those rules were not expressly incorporated into his Agreement.

Dr. Schindler knew when he took a leave of absence his hospital privileges were suspended. Whether by adverse action imposed by the medical peer review committee or by a voluntary leave of absence, the loss of medical staff privileges, either temporarily or permanently, constitutes a critical element of Dr. Schindler's ability to perform under his employment contract. The language of section 3.3 of the Agreement is clear and unambiguous. Ziegler Furniture & Funeral Home, Inc., 709 N.W.2d at 354. RHP was not obligated to give Dr. Schindler a notice of breach and 30-day right to cure before terminating his contract pursuant to section 3.3.2.

Dr. Schindler argues that even if there was no right to cure the breach, RHP never provided him with notice of his breach of the employment contract. He asserts the Agreement "does not mention 'surgery'" and so his loss of surgical privileges at RCRH does not constitute a breach of the contract. Id. at p. 14. This argument borders on the frivolous. RHP contracted to pay Dr. Schindler nearly $2 million per year for practicing medicine in his specialty as a "neurosurgeon." A " 'neurosurgeon' [is] a physician who specializes in neurosurgery." Dorland's Illustrated Medical Dictionary (32nd ed.) at p. 1271. See also Webster's Third New International Dictionary (2002) at p. 1521

16

("'neurosurgeon' [is] a surgeon who specializes in neurosurgery."). In Schedule 1 of the Agreement, Dr. Schindler's production compensation was to be based on RVUs for "[n]eurosurgery." (Dockets 1-1 at p. 19 and 28-1 at p. 19). The loss of surgical privileges at RCRH constituted a material breach of Dr. Schindler's employment contract. Neurosurgery was at the very heart of the Agreement and the reason RHP hired Dr. Schindler in the first place.

In each of its letters to Dr. Schindler's attorney, RHP reserved the right under the contract to take whatever action it deemed appropriate. Specifically, in the December 23, 2009, letter RHP reserved its contract rights, declaring "[t]he performance of neurosurgical services . . . is at the very heart of what the Agreement is all about, and RHP currently is not receiving those services from Dr. Schindler. Section 3.3.2 . . . provides RHP the right to terminate Dr. Schindler's employment 'for cause' in the event of any suspension of Dr. Schindler's medical staff appointment and privileges." (Docket 28-5 at p. 1). When Dr. Schindler lost his hospital privileges, even temporarily, he lost his ability to perform neurosurgery under his employment contract with RHP. The fact RHP sought to work with Dr. Schindler for four months after the loss of his hospital privileges does not change the right of the employer to terminate the contract for cause. RHP acted within its rights under the Agreement to terminate Dr. Schindler, effective immediately, on March 10, 2010. (Docket 28-6).

Defendant is entitled to summary judgment on count III of plaintiff's complaint.

## COUNTERCLAIM

As of March 10, 2010, RHP claimed Dr. Schindler was overdrawn $64,070.49 in his draw account. (Docket 25 ¶ 22). Defendant's counterclaim seeks recovery of this amount from Dr. Schindler. (Docket 6 at pp. 22-23).

Collateral to the date of termination issue is Dr. Schindler's claim he does not owe RHP for being overdrawn on his guarantee account on March 10, 2010. Dr. Schindler acknowledges the existence of the negative balance in his draw account, but asserts his "effective termination date did not occur until April 10, 2010, he was entitled to an additional 30 days compensation under his guarantee." (Docket 33 ¶ 22).

Again seeking application of section 3.3.7 of the Agreement, Dr. Schindler claims he was "entitled to an additional thirty days following his receipt of the March 10, 2010 letter . . . ." (Docket 33 at p. 9 ¶ 11). Using the same formula by which RHP calculated Dr. Schindler to be overdrawn by $64,070.49, Dr. Schindler believes he is entitled to an additional $88,144.39. Id. at p. 10 ¶¶ 13 and 14. He claims this would eliminate the deficiency. Id. ¶ 14.

For the reasons stated above relating to count III, Dr. Schindler's argument is without merit. The court finds Regional Health Physicians is entitled to summary judgment on its counterclaim against Dr. Schindler for $64,070.49.

18

In South Dakota "[p]rejudgment interest is . . . mandatory, not discretionary." Alvine v. Mercedes-Benz of North America, 620 N.W.2d 608, 614 (S.D. 2001). Because the plaintiff has other unresolved claims against the defendant, the court will wait until resolution of those claims to calculate and assess prejudgment interest on all claims.

## COUNT I: FAILURE TO PAY SALARY

RHP acknowledges it did not pay Dr. Schindler for the period of February 21, 2010 through March 6, 2010, or for the four days of March 7, 2010 through the date of termination, March 10, 2010. (Docket 24 at p. 15). RHP argues it did not pay Dr. Schindler "because he was already overdrawn." Id. When the decision to terminate Dr. Schindler was made he was already overdrawn on his guarantee account by $64,070.49. Id. at p. 16; see also supra.

For the same reasons stated above, Dr. Schindler was not entitled to any additional draws against his guarantee and is not entitled to additional salary. Defendant is entitled to summary judgment on count I of plaintiff's complaint.

## COUNT IV: TERMINATION FOR CAUSE – UNPAID PRORATED COMPENSATION

Using the same calculations above, Dr. Schindler claims he is still "owed $88,144.39 . . . in guaranteed compensation." (Docket 32 at p. 22). RHP acknowledges plaintiff "was entitled to any compensation due under his guarantee as of the date of termination." (Docket 24 at p. 17). However,

because Dr. Schindler was overdrawn by $64,070.49 as of March 10, 2010, RHP argues he was paid more than the prorated guarantee under the Agreement.   Id.

Dr. Schindler's argument is tied to his claim that the effective date of his termination should have been April 10, 2010.   It is only by asserting this projected last day of employment that Dr. Schindler arrives at the figure of $88,144.39.   For the same reasons this argument was rejected above, Dr. Schindler is not entitled to any additional compensation for the period March 11, 2010, through April 10, 2010.

Defendant is entitled to summary judgment on count IV of plaintiff's complaint.

## COUNT VI: DISABILITY SALARY CONTINUATION BENEFITS

One of the flexible benefits provided by RHP was "long-term disability insurance coverage under an individual policy made available by [RHP]." (Docket 28-21 at p. 11).   Schedule 2 of the Agreement described this benefit as "60% monthly salary replacement due to a disability up to $5,000 per month maximum."   (Docket 28-1 at p. 21).

On April 6, 2010, Dr. Schindler applied for long-term disability benefits through Unum Provident because of multiple sclerosis.   (Dockets 25 ¶ 29 & 28-15).   At the time he submitted his application, Dr. Schindler claimed to be disabled stating he "cannot function as a neurosurgeon."   (Dockets 25 ¶ 30, 33 ¶ 30 & 28-15 at p. 1).   On March 17, 2010, Dr. Schindler's physician had opined Dr. Schindler was justified in not performing surgery as of January 1, 2010.

(Dockets 33 ¶ 32 & 28-18).   During the course of this litigation, Dr. Schindler claimed to be permanently disabled as a result of his condition.   (Docket 33 ¶ 30).   On August 19, 2013, the United States District Court for the District of South Carolina, Columbia Division, in <u>Schindler v. Unum Life Insurance Company of America</u>, C/A No. 3:12-cv-00293-JFA, Docket 54, concluded Dr. Schindler was permanently disabled and entitled to disability benefits as of January 1, 2010.   (Dockets 25 ¶ 32 & 28-10).

RHP had a separate disability salary continuation plan.   (Docket 26-19). Schedule 2 of the Agreement provided that an employee is entitled to "100% of salary for 60 days in the event you are unable to work due to a health related problem."   (Docket 26-1 at p. 21).

RHP asserts it is entitled to summary judgment on Dr. Schindler's claim for disability salary continuation benefits because he "was not 'disabled' under the plan and he lost the benefit when he was terminated for cause."   (Docket 24 at p. 20).   Dr. Schindler counters first that he "never received a copy of the Disability Salary Continuation Plan . . . relied upon by RHP."   (Docket 33 at p. 24).   Dr. Schindler argues he can rely on the representations made in Schedule 2 for the benefits to which he is entitled.   <u>Id.</u>   Because Schedule 2 states the disability salary continuation plan allows for "100% of [his] salary for 60 days" and his own physician opined Dr. Schindler was "unable to work due to a health related problem," plaintiff asserts he is entitled to this benefit.   <u>Id.</u>   The definition of "permanently disabled" used in the Unum long-term disability

insurance policy is not before the court.   See Dockets 28-21 at pp. 20-22 & 28-10.

While it is true Schedule 2 described the disability salary continuation plan in general terms, it is unhelpful to claim the court cannot look to the detailed documentation describing the plan.   Certainly plaintiff could not argue the other benefits represented in Schedule 2, including health insurance, dental insurance, life insurance, group long-term disability, qualified pension plan and the tax sheltered annuity plan are limited only to the descriptions in Schedule 2. Were that the case, Dr. Schindler should have been restricted by Schedule 2 to long-term disability benefits of $5,000 per month as opposed to $15,000 per month provided in the policy with Unum Life Insurance Company.   Compare Docket 28-1 at p. 21 & Docket 28-10.

Whether RHP gave Dr. Schindler a copy of the disability salary continuance plan is irrelevant.   Schedule 2 identified the existence of such a benefit and it is expected and presumed an employee seeking benefits would examine the detailed and sometime complex provisions of the documents creating the benefit indicated.

The court must consider the disability salary continuation plan document as constituting part of RHP employees' flexible benefits package.   (Docket 28-19).   For purposes of the plan, the term " '[d]isability' means the [p]articipant must be sick or injured and unable to perform his normal duties for [RHP] for one or more days, as determined by [RHP]."   (Dockets 25 ¶ 34 & 26-19 § 2.6).

While Dr. Schindler's physician may have diagnosed him as suffering from a major illness, Dr. Schindler never took a sick leave day and was able to perform the duties required by his Agreement. While he was not performing surgery at RCRH because of the leave of absence, Dr. Schindler acknowledged "working over 70 hours per week, including but not limited to evaluating patients [and] supervising nurse practitioners who worked exclusively under his license . . . ." (Docket 32 at p. 2). Dr. Schindler has not produced any evidence indicating he submitted a written claim for disability salary continuation benefits because he was unable to perform his normal duties through the date of termination, March 10, 2010. (Docket 28-19 § 7.1.1). Dr. Schindler was not qualified to receive disability salary continuation coverage under the flexible benefits plan provided by his employer.

Defendant is entitled to summary judgment on count VI of plaintiff's complaint.

**COUNT VIII: FAILURE TO PAY CAPITAL ACCUMULATION ACCOUNT BENEFITS**

To vest in the capital accumulation account benefit offered by RHP, an individual must be an employee at the time of the vesting event. (Docket 25 ¶ 36). On November 20, 2008, Dr. Schindler withdrew all the funds from his capital accumulation account under a special provision of the Internal Revenue Code. (Dockets 28-9; 28-20 at p. 1 & 28-31 at p. 3 (p. 25:4-25)). Following the withdrawal of those funds, a new deferred vesting date of January 1, 2014, was

established.[14]   (Dockets 25 ¶ 38 & 28-20 at p. 4).   When Dr. Schindler chose to withdraw funds in 2008 he acknowledged in writing "if I terminate my employment prior to my elected [capital accumulation account] vesting dates . . . I will forfeit the balance of . . . my Capital Accumulation Account(s), unless I satisfy one of the following requirements—[t]ermination is due to my death or disability;[15] [t]ermination is involuntary without cause . . . ."   (Docket 28-9).

The capital accumulation account plan specifically provided that if an employee is terminated for cause prior to a deferred vesting date, the employee would forfeit all rights in the plan.   (Docket 28-21 at p. 28 ¶ 3.1.2) ("If, prior to the [d]eferred [v]esting [d]ate, the [p]articipant separates from service . . . under an [i]nvoluntary [s]eparation from [s]ervice with [r]easonable [c]ause, the [p]articipant shall forfeit all rights to receive any unpaid [c]apital [a]ccumulation [a]ccount [b]enefit under this [p]lan.").   "Reasonable cause" was defined in the plan to "mean[] . . . [f]ailure to substantially perform (for reasons other than [d]isability) the duties reasonably assigned or appropriate to the position, in a manner reasonably consistent with prior practice."   Id. at p. 26-27 ¶ 1.2.6.3. Specifically excluded from the term "reasonable cause" is "ordinary negligence or

_____

[14]Each year a new deferred vesting date would occur five years later. (Docket 28-31 at p. 3 (p. 24:2-10).

[15]If an employee terminates due to a qualifying disability, the investment account would be liquidated and a check issued to RHP.   RHP would withhold taxes and pay the net balance to the former employee.   (Docket 28-31 at p. 4 (pp. 28:25-29:18).

failure to act, whether due to an error in judgment or otherwise, if the [p]articipant has exercised substantial efforts in good faith to perform the duties reasonably assigned or appropriate to the position." Id. "Disability" is defined in the plan to mean "the [p]articipant, by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than 12 months, being unable to engage in any substantial gainful activity . . . ." Id. at p. 3 § 2.7(i); see also Docket 25 ¶ 40.

RHP seeks summary judgment on this claim arguing Dr. Schindler "was not vested at the time he was terminated, and he forfeited the unvested amounts because he was terminated for cause." (Docket 24 at p. 23). While "Dr. Schindler concedes . . . he was not employed by RHP on the [d]eferred [v]esting [d]ate" he claims entitlement to benefits under the disability provision of the plan.[16] (Docket 32 at p. 26). Dr. Schindler argues "he was disabled before . . . March 10, 2010, . . . Dr. Flitman diagnosed Dr. Schindler's disabling condition on March 17, 2010, and made the further unchallenged finding that Dr.

---

[16]It must be pointed out that RHPs' Flexible Benefits Plan, which includes a capital accumulation account provision, was not attached to Dr. Schindler's employment contract. Compare (Dockets 1-1 & 28-21). Yet, when the detailed explanation may provide some benefit to Dr. Schindler, he would prefer to use the plan rather than the benefit summary contained on Schedule 2 attached to his employment contract. The court notes Dr. Schindler's contradictory attempt to claim the Schedule 2 representations or to disregard them in furtherance of his arguments.

Schindler was justified in not conducting surgery beginning on January 1, 2010, given his symptoms." Id.

"Disability" for purposes of RHPs' flexible benefits plan, including access to a capital accumulation account, requires that the physical impairment made Dr. Schindler "unable to engage in any substantial gainful activity . . . ." (Docket 28-21 § 2.7). During the period between October and the end of December 2009, Dr. Schindler was engaged in "substantial gainful activity" and admitted this by his own proposed statement of fact: "During October, November, and December 2009, Dr. Schindler was the sole neurosurgeon at RHP, managing an enormous practice of his own including the practice of his newly retired partner and working greater than 70 hours per week caring for the needs of these RHP patients." (Docket 33 at pp. 8-9 ¶ 7). Without suggesting a break in his job performance or disclosing a change in his work level through March 10, 2010, Dr. Schindler acknowledges:

> During his leave of absence, it is undisputed that Dr. Schindler continued to fulfill his clinical responsibilities. He continued to run an incredibly busy practice as the only practicing neurosurgeon at RHP as well as in Northeast South Dakota (Aberdeen outreach clinic), working over 70 hours per week, including but not limited to evaluating patients, supervising nurse practitioners who worked exclusively under his license . . . .

(Docket 32 at p. 2).

The language of the flexible benefits plan is clear and unequivocal.

(Docket 28-21 at p. 28 §§1.2.3 and 3.1.2). Ziegler Furniture & Funeral

Home, Inc., 709 N.W.2d at 354.  By the definition of disability applicable to the capital accumulation account program, Dr. Schindler was not disabled through March 10, 2010, the final date on which he could have qualified for the benefits.

Documentation signed by Dr. Schindler acknowledged and put him on notice that he did not have a vested interest in the capital accumulation account as of March 10, 2010.  (Docket 28-20 at pp. 1, 4 & 8).  In order to be vested in this account for funds deposited by RHP in 2009 and 2010, Dr. Schindler must have been an employee of RHP on January 1, 2014, and January 1, 2015, respectively.  Id. at pp. 4 & 8.  Dr. Schindler was not employed on those dates because he was terminated for cause under his employment contract and for "reasonable cause" under the capital accumulation account provisions. (Docket 28-21 at p. 28 § 3.1.1).  The funds contributed to the account on his behalf by RHP never became funds to which Dr. Schindler was entitled.

RHP is entitled to summary judgment on count VIII of plaintiff's complaint.

**COUNT IX: EXTENDED ILLNESS ACCRUAL BANK BENEFITS**

RHP had a personal leave and extended illness accrual bank program. (Docket 26-14).  Dr. Schindler elected to participate in the extended illness accrual bank ("EIAB") program.  (Docket 1 ¶ 64).  Schedule 2 of the Agreement indicates he would accrue six days per year at full salary in the event of extended illness or disability.  Id.; see also Docket 28-1 at p. 21 (the EIAB benefit conferred a "[m]aximum of 122.5 days (980 hours) accrued at rate of six (6) days per year providing full salary in event of long-term illness/disability.").

Dr. Schindler was never given a copy of the personal leave and illness program. (Docket 33 ¶ 44). Dr. Schindler claims he is qualified by the language of Schedule 2 to receive the EIAB benefits. (Docket 32 at p. 20).

For the same reasons applicable to the other benefits which were subject to the employer's flexible benefits plan, the court must look to the detailed explanation of the EIAB benefits plan. See Docket 28-14. The plan specifically stated "EIAB accruals will not be paid as a terminal benefit." Id. § D(3). The language of the EIAB program is clear and unequivocal. Ziegler Furniture & Funeral Home, Inc., 709 N.W.2d at 354. Dr. Schindler was not entitled to a pay-out of any accrued EIAB as of the date of his termination from employment.

RHP is entitled to summary judgment on count IX of plaintiff's complaint.

## COUNT X: GROUND TRANSPORTATION EXPENSES

Schedule 4 of the Agreement addresses transportation expenses incurred by Dr. Schindler for his employer's benefit. It states that the "[e]mployer shall provide for and/or pay for or reimburse [p]hysician for the cost of transportation either by air or by car to/from Aberdeen in accordance with the agreed upon schedule as well as reasonable accommodations for [p]hysician while providing services in Aberdeen if needed." (Dockets 1-1 at p. 24 & 28-1 at p. 24). It is undisputed that RHP reimbursed Dr. Schindler for all air transportation expenses incurred during his employment. (Dockets 25 ¶46 & 33 ¶ 46).

In count X of his complaint, Dr. Schindler seeks reimbursement for out-of-pocket expenses for round-trip travel by automobile from the Rapid City clinic to

the Rapid City Regional Airport and from the Aberdeen airport to the Aberdeen outreach clinic. (Docket 1 ¶ 70). Dr. Schindler argues the language of Schedule 4 is ambiguous. (Docket 32 at p. 23). Thus, he argues "as the non-moving party, Dr. Schindler is entitled to the benefit of any factual inference the Court may draw from the facts on this claim." Id. Dr. Schindler asserts because RHP paid Dr. Charles Hart's mileage to-and-from the airport, the court should apply the same interpretation to Dr. Schindler's Agreement. Id.

Addressing the costs subject to reimbursement, Schedule 4 is written in the disjunctive. The phase "cost of transportation either by air or by car" is clear and unambiguous. Ziegler Furniture & Funeral Home, Inc., 709 N.W.2d at 354. If Dr. Schindler had driven from Rapid City to Aberdeen, that mileage would have been subject to reimbursement. But because Dr. Schindler flew to the Aberdeen outreach clinic and back to Rapid City that is the cost which was subject to reimbursement. How RHP dealt with Dr. Hart's transportation expenses is irrelevant to Dr. Schindler's Agreement. Had the parties intended to reimburse Dr. Schindler for his expenses for driving to and from the airports, the phrase would have been written in the conjunctive, using language like "both by air and by car."

Applying the clear language of Schedule 4, Dr. Schindler is not entitled to additional reimbursement. RHP is entitled to summary judgment on count X of plaintiff's complaint.

**ORDER**

Based on the above analysis, it is

ORDERED that the defendant's motion for partial summary judgment motion (Docket 23) is granted.

IT IS FURTHER ORDERED that counts I, II, III, IV, VI, VIII, IX, X and XII of plaintiff's complaint are dismissed with prejudice.

IT IS FURTHER ORDERED that defendant's motion for summary judgment on its counterclaim (Docket 6 at pp. 22-23) is granted.

IT IS FURTHER ORDERED that Regional Health Physicians, Inc., is entitled to a money judgment against plaintiff Dr. Jay J. Schindler in the amount of $64,070.49.

IT IS FURTHER ORDERED that because plaintiff has unresolved claims against the defendant, the court will wait until resolution of those claims to calculate prejudgment interest on defendant's money judgment.

Dated September 23, 2015.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
CHIEF JUDGE